# WILLIAM S. JAMES *v.* CHARLES B. ANDERSON, JR., ETC., ET AL.

[No. 8, September Term, 1977.]

*Decided September 23, 1977.*

138

*Motions for reconsideration filed October 21, 1977; denied October 31, 1977.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Cypert O. Whitfill,* with whom were *T. Carroll Brown* and *Charles H. Reed* on the brief, for appellant.

*Peter Parker* and *Maurice W. Baldwin, Jr., Deputy County Attorney,* with whom was *John E. Kelly, County Attorney,* on the brief, for appellee Charles B. Anderson, Jr. *George W. Liebmann* for appellee Tatar, Lininger, Clark & Wood, Inc.

ELDRIDGE, J., delivered the opinion of the Court.

We are here faced with several issues concerning the proposed expenditure of monies for the construction of courthouse facilities in Harford County.

In 1970, the Harford County Commissioners appointed a citizens' committee to review the need for additional court facilities in the county. The committee recommended the construction of an addition to and the renovation of the existing Harford County courthouse. This recommendation was adopted by the County Commissioners.

Subsequently, the General Assembly of Maryland adopted

Ch. 316 of the Acts of 1972 which authorized "the County Commissioners of Harford County to borrow . . . an amount not exceeding a total of Five Million Dollars . . . to finance the cost of site and improvements acquisition, construction, improvement or extension of the court house in said County." Following the enactment of Ch. 316, the Harford County Commissioners engaged an architectural firm to design the courthouse renovation and addition, and also purchased, at a cost in excess of $325,000, the land to the rear of the existing courthouse for the addition to the courthouse.

In November 1972, the voters of Harford County adopted a "charter" form of government and the Harford County Charter. Under this charter, the executive power in Harford County became vested in a County Executive, with the County Council being the County's legislative body. In January 1973, representatives of the County Executive and County Council were advised of the background and status of the courthouse project.

Subsequently, the County Executive submitted a budget to the County Council which provided for the courthouse project. The County Council adopted the budget, appropriated the funds for the courthouse project, and, later, authorized the sale of $5,000,000 in bonds, the proceeds to be used for the courthouse project.

Late in 1974, subsequent to the sale of the bonds, the courthouse project was advertised for bids. The County Executive rejected all bids received because they were in excess of the remaining bond proceeds. The County Executive, however, requested and received an extension from the bidders, and then requested additional bonding authority from the County Council. The County Council responded with Resolution No. 1-75, in which it declared that the council "will authorize necessary funding in future bond issues for the completion of the Court House complex when requested by the County Executive after his awarding of the contract."

On the next day, the County Executive again rejected all bids and issued a press release stating that he was

abandoning the project because of the severe fiscal problems which Harford County might be facing in the coming months.

Several months later, the County Executive proposed to the County Council the formation of a Courthouse Project Review Board to study the then existing situation pertaining to the building of additional court-related facilities. This board was subsequently formed, a member of the County Council serving on the board as its representative. On recommendation of the board, an advertisement was placed, soliciting the services of architects. Some 20 responses were received, and the Courthouse Project Review Board reduced the number of architects to be considered to four. In December 1975, the County Executive executed an agreement on behalf of Harford County with one of these four firms, Tatar, Lininger, Clark & Wood, Inc.; part of this agreement concerned a feasibility study of the various available courthouse sites. Following the recommendation of this feasibility study, on July 7, 1976, the County Executive announced that he had authorized the firm of Tatar, Lininger, Clark & Wood, Inc., to proceed with the design of a new courthouse, to be constructed on a different site than the then existing courthouse.

On September 8, 1976, the plaintiff, William S. James, instituted an action in the Circuit Court for Harford County for a declaratory judgment, naming the County Executive as defendant and asking the court to declare, *inter alia,* that the Harford County Charter and the Capital Improvements Program and Budget as adopted by the Harford County Council preclude the County Executive from using the bond proceeds for the construction of the new courthouse on a new site. The architectural firm of Tatar, Lininger, Clark & Wood, Inc., was later allowed to intervene as a defendant.

Both defendants filed motions for summary judgment, arguing: (1) that William James had no standing to bring this action; (2) that the action was barred by laches; and (3) that the laws authorizing the bond issue empowered the County Executive to spend the proceeds from the bond sale in the manner described above.

The circuit court granted the defendants' motions for summary judgment, holding that the plaintiff had standing and that his claim was not barred by laches, but that the County Executive was authorized by law to proceed with the new courthouse.

The plaintiff then took an appeal to the Court of Special Appeals. Before any proceedings in that court, we granted the plaintiff's petition for a writ of certiorari.

(1)

Initially, the defendants renew their contention that the plaintiff has no standing to maintain this action.

The plaintiff brought this action "in his own behalf and on behalf of the taxpayers of Harford County," and he alleged that he was a taxpayer of the State and of Harford County. The defendants argue that the expenditure planned by the County Executive would in fact be less than the expenditure required to renovate the old courthouse, and that, as such, the plaintiff had not alleged any special damages or pecuniary loss which would entitle him, as a taxpayer, to maintain the action.

The plaintiff in his bill of complaint did, however, claim that it would be more efficient for the courts and their supporting agencies to operate in close proximity, as is called for in the renovation project. This appears to us to be in principle indistinguishable from the allegations made in *Citizens Planning & Housing Ass'n v. Co. Executive of Baltimore Co.*, 273 Md. 333, 329 A. 2d 681 (1974). In that case, several individuals, alleging that they were taxpayers of Baltimore County, brought an action to prevent the County Executive of Baltimore County from reorganizing the Baltimore County Office of Zoning and Planning. It was alleged that under the Baltimore County Charter, only the County Council had power to reorganize that office, and that, therefore, the action of the County Executive was *ultra vires*. To show their special damages as taxpayers, plaintiffs alleged that the change proposed by the County Executive would cause the Office of Zoning and Planning to operate

less efficiently, consequently impairing the property base of the county and causing an increase in taxes.

In holding that the plaintiffs in *Citizens Planning* had standing to maintain the action, this Court, speaking through Judge Levine, stated (273 Md. at 344):

> "The courts below attached considerable significance to what they regard as conclusory language in the bill of complaint. Concededly, the allegations might have been particularized in greater detail, but this shortcoming may have been unavoidable in the unique circumstances of this case. The extent to which a taxpayer is capable of detailing the damage anticipated from an illegal and *ultra vires* act, such as is alleged here, may be rather limited at the time the suit is initially filed. . . . [A]ppellants are not required to allege '. . . facts which *necessarily* lead to the conclusion that taxes will be increased.' . . . The test is whether appellants reasonably *may* sustain a pecuniary loss or a tax increase; . . . [or] whether there has been a showing of *potential* pecuniary damage."

The position of the plaintiff in the instant case is, in substance, identical. The plaintiff challenges, as *ultra vires*, the actions of a County Executive, and points to a claimed decrease in efficiency which would result from the alleged *ultra vires* acts. As in *Citizens Planning & Housing Ass'n v. Co. Executive of Baltimore Co., supra*, this is sufficient for a taxpayer of the county involved to maintain a suit.[1]

(2)

Next, the defendants argue that the plaintiff's action is barred by laches. The contract with the architectural firm

---

1. The plaintiff also claims that, as a member of the Maryland and Harford County Bars, he has standing to assert his right to practice law and have facilities adequate to accommodate the speedy and efficient flow of justice. However, in light of our holding that he has standing as a taxpayer, it is not necessary for us to reach this question.

Tatar, Lininger, Clark & Wood, Inc., was signed by the County Executive on December 8, 1975, and the instant action was not instituted until September 8, 1976, some nine months later. It is asserted that, in the interval, substantial sums were expended in architect's fees in reliance upon the contract. This delay in bringing suit, defendants allege, is unconscionable.

While it is true that the contract with Tatar, Lininger, Clark & Wood, Inc., was awarded December 8, 1975, the terms of that contract required the architects to conduct a feasibility study of the various available courthouse sites. One of the sites they were required to consider was the present site of the Harford County courthouse. Thus, until some recommendation from the architects was forthcoming, it was not possible to know whether the plan for renovation and enlargement of the present courthouse was to be continued. It is undisputed that it was on July 7, 1976, that the County Executive announced he had abandoned the renovation project and authorized the Tatar firm to proceed with the design of a new courthouse, to be constructed on a different site than the then existing courthouse. Thus, the plaintiff's action was instituted approximately two months after the announcement that the renovation project was to be abandoned. In light of these circumstances, we believe that the chancellor was fully justified in concluding that there was no unconscionable delay in bringing the action.

(3)

The principal issue in this case is whether the County Executive of Harford County is empowered to spend funds in the manner described here. The plaintiff relies on language incorporated into the Annual Budget and Appropriations Ordinance enacted by the Harford County Council, which, he maintains, limits the expenditure of the bond proceeds to an addition to the present courthouse facilities. The defendants, on the other hand, rely on language in bond authorization legislation which, they maintain, contemplates the expenditure of the bond

proceeds for the construction and design of a new courthouse on a different site. The resolution of this issue necessarily entails a review of the budget and spending provisions of the Harford County Charter.

The Harford County Charter provides for a type of executive budget system. Under that system, the County Executive has the prime responsibility for the preparation of the annual budget. Sections 504 and 505 of the Harford County Charter provide that all county agencies which receive or disburse funds shall, at specified times, submit to the County Executive a detailed program, including an estimate of the anticipated expenditures and revenues for the forthcoming year, as well as an itemized list of the capital projects to be undertaken in the ensuing fiscal year and the next succeeding five fiscal years. These sections of the charter further provide that the County Executive at his discretion may amend the agency proposals, and that thereafter he must cause to be prepared the county budget. The charter mandates that the county budget shall consist of "the current expense budget, the capital budget and capital program, and the budget message." Section 503. We are here directly concerned with the capital budget and capital program. Section 507 of the county charter states:

> "The proposed capital budget and capital program shall be arranged to set forth clearly the plan of proposed capital projects to be undertaken in the ensuing fiscal year and in each of the next five fiscal years and also the proposed means of financing the same. The capital budget shall include a statement of the receipts anticipated during the ensuing fiscal year from all borrowing and from other sources for capital projects."

The preparation of the capital budget and capital program in Harford County is done on what are termed "project estimate" sheets, which are combined to form the "Budget Book." The project estimate sheet concerning the County courthouse project provides, in pertinent part:

"PROJECT TITLE AND DESCRIPTION: Addition to County Court House, Main Street, Bel Air.

"JUSTIFICATION: The County Commissioners of Harford County entered into an architectural contract in August . . . [1972] for expansion of the present Court House Facilities. This addition will provide more space for all court facilities and court re-lated functions."

After the county budget has been prepared, the County Executive is required to submit the proposed budget to the Harford County Council.

As in most executive budget systems, the role played by the legislative branch is limited. The County Council's approval is necessary before the budget can become law, and the Council possesses the power to delete or decrease provisions in the proposed budget, but it may not, of its own accord, initiate new provisions or increase proposed provisions in the county budget. According to § 512 (a) of the charter:

"After the public hearings, the Council may decrease or delete any items in the budget except those required by the laws of this State or of this County, and except any provisions for debt service on obligations then outstanding or for estimated cash deficits. The Council shall have no power to change the form of the budget as submitted by the County Executive, or to alter the revenue estimates except to correct mathematical errors, or to increase any expenditure recommended by the County Executive for current expense or capital purposes."

Unlike the State's executive budget system, a detailed

budget bill is not submitted to the legislature along with the budget. Rather, according to § 512 (b) of the county charter,

"[t]he adoption of the current expense budget and the capital budget shall be by the affirmative vote of at least four members of the council by a law to be known as the Annual Budget and Appropriation Ordinance."

Bill No. 73-8, passed by the Harford County Council in its 1973 legislative session, was the Annual Budget and Appropriations Ordinance for the fiscal year ending June 30, 1974. In pertinent part, the Ordinance provides:

"*Section 2.* Be it further enacted, that *the Capital Budget for the fiscal year ending June 30, 1974, is hereby approved and adopted* for such fiscal year; and funds for all expenditures *for the purposes specified in the Capital Budget* during the fiscal year beginning July 1, 1973, and ending June 30, 1974, and during the subsequent fiscal years, as specified in Section 519 of the Charter of Harford County, Maryland, are hereby appropriated in the amounts hereinafter specified, and for the purposes hereinafter indicated as follows:" (Emphasis supplied.)

Section 2 of the Ordinance continues with a list of the appropriations made by the County Council. Number 8 on this list is entitled "Operational Buildings." One of the subdivisions of this list is entitled "General Obligation Bond Fund Appropriation," which appears to embrace the County courthouse project.

Section 2 of the Annual Budget and Appropriations Ordinance accomplishes two purposes. First, it adopts by reference the capital budget portion of the proposed budget submitted by the County Executive — "Be it further enacted, that the Capital Budget . . . is hereby approved and adopted." Thus, the project estimate sheets are incorporated by reference into the Budget Ordinance. This, in fact, is mandated by the county charter, since the "Council *shall*

*have no power to change the form of the budget* as submitted by the County Executive" (emphasis supplied). Section 512 (a). Second, the Ordinance appropriates funds for "the purposes specified in the Capital Budget."

Once the budget has been approved and funds appropriated, § 515 of the charter requires the County Council to cause to be raised the amount of taxes required by the budget so that the budget shall be balanced. In addition, § 512 (b) provides:

> "Any borrowing to finance capital projects must be authorized by an existing law of the General Assembly of Maryland or by a law of the Council adopted in accordance with this Charter."

Pursuant to § 512 (b), on March 12, 1974, the Harford County Council passed Bills Nos. 74-24 and 74-25, authorizing Harford County to issue and sell bonds for the purpose of funding the courthouse project. The title to 74-25 stated, in pertinent part:

> "AN EMERGENCY ACT
> to authorize and empower Harford County, Maryland, to borrow on its full faith and credit and issue and sell its bonds therefor within three fiscal years from the date this Act becomes effective, an amount not exceeding $5,100,000, such bonds to be designated 'Harford County Public Building Bonds of 1974', *the proceeds thereof to be used for* the construction, renovation, reconstruction, improvement, extension, site and improvement acquisition, alteration, repair and modernization of *the present buildings used for court house purposes or new facilities* in Harford County." (Emphasis supplied.)

In summary, therefore, three steps are necessary before bond money may be spent on a capital project in Harford County.

1)  A budget must be prepared by the County Executive which includes the capital project (the project estimate sheet);

2)  The budget provision must be approved and funds appropriated to the project by the County Council (the Annual Budget and Appropriations Ordinance, being Bill No. 73-8);

3)  The bond sale funding the project must be authorized by a County Council ordinance (Bills Nos. 74-24, 74-25), or by an existing law of the General Assembly.

All of these steps were taken in the instant case. The question now before us is which of these acts establishes the scope within which the bond proceeds must be expended. The plaintiff maintains that the project estimate sheet, incorporated by reference into the Annual Budget and Appropriations Ordinance, is controlling. The defendants point to language in the General Assembly's initial authorization of a bond issue in Ch. 316 of the Acts of 1972, and also to language in the County Council's bond authorization bills, Nos. 74-24 and 74-25, and argue that these enactments mark the limits of the County Executive's authorization to expend funds.

Preliminarily, we do not think that the provisions of Ch. 316 are pertinent to the disposition of this case. It is clear from the record that the County Executive and County Council of Harford County proceeded with the courthouse project without reliance upon the bond authorization provisions of Ch. 316 of the Acts of 1972. Instead, the County Executive and County Council intended that the bond sale be authorized by County ordinances Nos. 74-24 and 74-25, which stated that Harford County "is *hereby* authorized and empowered to borrow . . . [$5,000,000]" (emphasis supplied). Moreover, Art. XI-A, § 3, of the Maryland Constitution provides that counties that adopt a charter form of government "have full power to enact local laws . . . including the power to repeal or amend local laws . . . enacted by the General Assembly." *See Murray v. Director of Planning,* 217 Md. 381, 143 A. 2d 85 (1958). In the

circumstances of the instant case, the County's subsequent enactment of the budget and the bond authorization legislation for the same capital project clearly repeals by implication any inconsistent provisions of Ch. 316 of the Acts of 1972 relating to the authorization of bonds and the appropriation of the proceeds.

However, assuming for the purpose of argument that either Ch. 316 or the County Council's bond authorization bills contemplate the use of the bond proceeds for construction of a new courthouse on a new site, this in itself would not be sufficient to authorize the County Executive to expend funds in that manner. Section 521 of the charter provides that neither the County Council nor the County Executive may authorize any obligation for any capital project *not included in the county budget*:

"Section 521. RESTRICTIONS ON CAPITAL PROJECTS; AMENDMENT TO CAPITAL BUDGET AFTER ADOPTION OF BUDGET. *No obligations of the County shall be authorized in any fiscal year for or on account of any capital project not included in the County budget* as finally adopted for such year; provided that upon receipt of a recommendation in writing from the County Executive, the Council may after public hearing and with the affirmative vote of at least five of its members, amend the County budget in accordance with such recommendation without increasing the total amount of appropriations therefor." (Emphasis supplied.)

Clearly, under this charter provision, the capital budget, not the bond authorization bills, controls the purposes for which bond monies are to be authorized and expended. Unless a particular capital project is included in the capital budget, the Harford County Charter prohibits the authorization of a bond issue to fund such a project. A bond bill which attempts to authorize the funding of capital projects beyond the scope of the capital budget is ineffective to that extent.

Moreover, the mere fact that the title of Bill No. 74-25 authorizes Harford County "to issue and sell its bonds . . . , the proceeds thereof to be used for . . . repair and modernization of the present buildings used for courthouse purposes or *new facilities* in Harford County" (emphasis supplied), does not indicate that the County Council, by the enactment of 74-25, intended or acquiesced in the expenditure of the bond proceeds for new facilities. This type of broad clause is not unusual in bond authorizations. Its insertion is not inconsistent with the County Council's intention, at that time, to limit the expenditure of the proceeds to the renovation project. If, for example, the renovation of the courthouse became impracticable, the County Executive could have returned to the County Council and asked it to amend the capital budget to include the construction of *new* facilities as a capital project.[2] The proceeds of the bond issue would, then, become authorized for this new purpose. This procedure, of course, preserves the Council's power to refuse to amend the budget, or delete the construction of new facilities from the next year's capital budget, if it should disagree with the County Executive on a proposed new course. In the instant case, it is noteworthy that the County Executive twice proposed amendments to the capital budget, requesting the County Council to include the acquisition of a new courthouse site as a new capital project. Both of these requests were rejected by the County Council.

Therefore, the only capital project pertaining to a courthouse authorized by the Harford County Council was that authorized by the capital budget. That is, the scope of the County Executive's authority to expend bond monies on the courthouse project is limited by the pertinent project estimate sheets, incorporated by reference by the County Council in its Annual Budget and Appropriations Ordinance. In this project estimate sheet, the "TITLE AND DESCRIPTION" clause for the courthouse project is limited

---

2. Sections 521 and 516 of the Harford County Charter set forth a procedure by which the capital budget may be amended and, thereafter, appropriations transferred from one capital project to another.

to an "addition to the County Court House, Main Street, Bel Air." The "JUSTIFICATION" clause in the project estimate sheet refers to the architectural contract entered into by the County Commissioners "for expansion of the present Court House Facilities," and then refers to "this addition." This language contemplates an addition, not a new building. It further contemplates a particular and identifiable place. The construction of a *new courthouse* at a *different site* is not authorized by this budget provision.

Thus, the construction of a new courthouse at a different site would be a new capital project, not included in the capital budget. In effect, then, the County Executive's proposed expenditure is an attempt to transfer funds from an existing capital project to a new capital project which was neither contained in the original budget nor included in the budget via the amendment process detailed in § 521. The Charter of Harford County expressly forbids this action. Section 516 of the charter provides:

> "Inter-project transfers of appropriations between capital projects in the capital budget may be authorized by legislative act of the Council upon request of the County Executive, but no new project shall be created nor any abandoned except in accordance with Section 521 of this Charter."

Thus, the County Executive of Harford County does not have the authority to use bond monies which were budgeted and appropriated for the renovation and enlargement of the existing courthouse for the design and construction of another courthouse on a different site.

> *Judgment reversed and case remanded to the Circuit Court for Harford County for further proceedings not inconsistent with this opinion.*
> *Respondents to pay costs.*